Yard v. Ocean Beach Association.

HENRY H. YARD, appellant,

v.

THE OCEAN BEACH ASSOCIATION, respondent.

1. The statute of limitations applies as well to the board of proprietors as to individuals, and an adverse possession of twenty years will bar a right of entry or recovery under title derived from that source.

2. There is no difference between the character of the evidence or the degree of proof required to sustain title by adverse possession against the board of proprietors and that which is required to sustain such title against an individual owner.

3. A tract of land consisting of upland and waste land, lying between the enclosed upland and the ocean, covered with sedge grass and at times over-flowed by the tide, held under a title, one of the boundaries of which was the Atlantic ocean—*Held*, that the occupation of the upland, together with the exercise of such acts of ownership and dominion over the sedge meadow and the beach as their situation and condition permitted, was evidence of a possession which by lapse of time would ripen into title by adverse possession down to the water's edge.

4. The order of the council of proprietors to its surveyors in making surveys to establish a beginning corner and then confine themselves to strict courses and distances, adopted the most unreliable *indicia* of location and boundaries known to conveyancers. The courts, in the location of such surveys, will resort to every kind of evidence that is competent to establish a disputed boundary.

5. The word "adjoining" in the description of premises conveyed means next to or in contact with, and excludes the idea of any intervening space. The description of the premises granted as "adjoining the Atlantic ocean," with the additional words "bounded on the ocean," carries title to the line of ordinary high water, with all the incidents of riparian ownership upon tidal waters.

6. Possession in fact, as distinguished from that constructive possession which arises simply in virtue of legal title, is essential to the jurisdiction of the court of chancery under the act (*Rev. p. 1189*) to compel the determination of claims to real estate and to quiet the title to the same. But actual possession of the principal tract is sufficient possession of adjoining unenclosed pieces of lands held under the same title and used in connection therewith to confer jurisdiction to quiet the title to the latter.

7. Where the volume of evidence taken before a master is swelled by testimony taken by the prevailing party, which is unimportant or irrelevant or

taken with needless prolixity, the court, in awarding costs in his favor, will disallow the costs and expenses of taking and printing such testimony.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Ocean Beach Association* v. *Yard, 3 Dick. Ch. Rep. 72.*

*Mr. John R. Emery,* for the appellant.

*Mr. Cortlandt Parker* and *Mr. Barker Gummere,* for the respondents.

The opinion of the court was delivered by

DEPUE, J.

This is a bill to quiet title, filed under the act of March 2d, 1870. *Rev. p. 1189.*

The lands in controversy are within the bounds of the map of Ocean Beach. The tract owned by the Ocean Beach Association comprises a seaside village. In 1879 the defendant, then being a member of the Ocean Beach Association, made for the association a map of its property, which was lithographed, and is called the map of dedication. This map delineated the tract owned by the association as lying south and east of Shark river, and extending southerly to a line which would embrace the lands in controversy, and eastwardly to the Atlantic ocean. On this map the tract was laid out into lots, with the streets delineated upon it. Along the ocean front a strip of land, about two hundred feet wide, was left between the lots and the ocean, marked on the map, " Ocean Bluff." The streets were delineated on the map as extending eastwardly towards the ocean and leading into the ocean bluff, which is a space of ground intended for the common use of the owners of lots and the public, for recreation and access to the ocean.

The lands in controversy consist of detached pieces in the streets marked on the dedicating map, and a strip on the bluff extending along the entire ocean front.

The premises are set out in the complainant's bill as consisting of four parcels.

The vice-chancellor described the lands claimed by the complainant as bounded on the north by Shark river, on the south by Three-Cornered pond, on the west by lands of other parties, and on the east by the Atlantic ocean. Nearly equidistant between Shark river and Three-Cornered pond is another body of water, called Silver lake or West pond. The land claimed by the defendant the vice-chancellor described as consisting of two different parcels, one lying north of West pond, adjoining the Atlantic ocean, containing thirty-one and eight hundred and fifty-seven thousandths acres; the other lying south of West pond and north of Three-Cornered pond, and near to, although not bound by, the waters of the Atlantic ocean, containing eight and forty-eight hundredths acres. The last of these parcels purports to be a strip of land between what are called the Brinley survey, for one hundred and eighty-three and twenty-five hundredths acres, dated December 2d, 1861, and the Corlies survey, made August 30th, 1870, and returned and approved November 1st, 1872. These surveys will presently be referred to with particularity.

The vice-chancellor considers, first, the title to the parcel lying north of West pond, and between that pond and Shark river.

To this parcel the complainant claims title by divers mesne conveyances, under a conveyance made by Joseph Waddell to John Lippell White, bearing date September 1st, 1800, acknowledged December 31st, 1800, and recorded January 28th, 1801. The premises conveyed by this deed consists of a tract of six hundred acres, lying between Shark river and the Three-Cornered pond. John Lippell White died in June, 1831, devising this tract to his two sons, Peter and Richard. Richard released to Peter that part of the tract which lies between West pond and Shark river, containing two hundred and thirty acres. Peter conveyed this parcel, November 1st, 1872, to Joseph B. Yard, who is not the defendant. Joseph B. Yard also acquired of Richard White an adjoining lot of fourteen and thirty-three hundredths acres next to West pond. By a deed dated May

26th, 1873, Joseph B. Yard conveyed these two tracts to the Ocean Beach Association, which gave the association title to the parcel lying between West pond and Shark river. To this parcel the vice-chancellor adjudged title in the complainant by adverse possession.

The statute of limitations applies as well to the Board of Proprietors as to individuals, and an adverse possession of lands for twenty years will bar a right of entry or recovery under title derived from that source. *Cornelius* v. *Giberson, 1 Dutch. 1.* Nor is there any difference between the character of the evidence or the degree of proof required to sustain title by adverse possession against the Board of Proprietors and that which is required to sustain such title against an individual owner. The board not being excepted from the operation of the statute, possession such as would bar the claim of the rightful owner, if he be an individual, will be equally efficacious against the proprietors.

The Waddell deed to White was made in September, 1800, and recorded January, 1801. The tract conveyed consisted of upland and sedge meadows and a sandy beach along the river and the sea. In the deed it is described as situate, lying and being on the south side of Shark river, with two sedge banks near the mouth of said river, being included within the following bounds: Bounded northerly by Shark river, easterly by the sea, southerly by a pond called Three-Cornered pond, and westerly by the upland of —— &c. The descriptive words contained in the deed comprised premises extending to and bounded upon the ocean. The survey made by the defendant, under which he claims title, was located on the easterly side of a fence along the upland and extending from thence to the ocean.

At the time the Waddell deed was made there was a farmhouse on the tract, which was rebuilt in 1810. From the making of the conveyance to White, the tract was occupied and cultivated by those holding under the Waddell conveyance, and their possession and occupation was under color of title at least. The evidence clearly shows that White and those who succeeded to his title always claimed title to the ocean, and that their right

as riparian owners was generally, if not universally, recognized in the neighborhood.

The general rule is that, in a controversy in which title by adverse possession is set up, possession of the principal tract is regarded as possession of adjoining waste and unenclosed pieces of land held under the same title and used in connection therewith. *Sedgw. Trial of Titles* § *774.* In this case, it appears that the grantee of Waddell, and those succeeding him in title, used the sedge meadows outside of the fence enclosing the upland for pasturing cattle, and erected fences to the ocean to prevent cattle straying or trespassing, and carted off seaweed and drift wood and fragments of wrecks thrown upon the beach. In *Lord Advocate* v. *Young, 12 App. Cas. 544, 553,* Lord Watson, speaking of a claim of title to the foreshore by prescription as against the Crown, said : " It is practically impossible to lay down any precise rule in regard to the character and amount of possession necessary to give a riparian proprietor a prescriptive right to the foreshore. Each case must depend upon its own circumstances. * * * In estimating the character and extent of his possession, it must always be kept in view that possession of the foreshore, in its natural state, can never be, in the strict sense of the term, exclusive. The proprietor cannot exclude the public from it at any time, and it is practically impossible to prevent occasional encroachments on his right, because the cost of preventive measures would be altogether disproportionable to the value of the subject."

These remarks, though relating to title by prescription to the foreshore, which is Crown property, apply with equal force to waste land lying between the upland and the waters of the ocean, which is covered by sedge grass and at times overflowed by tides, making cultivation and enclosure by fences impracticable. In the present case, it appears clearly by the evidence that the owners of the Waddell title exercised acts of ownership and dominion continuously over the sedge meadows and beach down to the water's edge, of such a nature and character as the condition and situation of the premises permitted and so far as was practicable. The evidence touching their possession was such as was held by

this court in *Foulke* v. *Bond, 12 Vr. 527,* to be competent evidence of an adverse possession. The proof on this subject is plenary, and I agree with the vice-chancellor that the evidence is most conclusive of an actual, open, continued and hostile possession, under the Waddell title, of the strip of land in controversy for more than three-quarters of a century.

To the second of the parcels in controversy, that lying south of West pond, the defendant's claim of title depends upon the location of two prior surveys—the one to Brinley, made December 2d, 1861, for one hundred and eighty-three and twenty-five hundredths acres; the other by Corlies for himself, made August 30th, 1870, for a tract of thirty-four and ninety hundredths acres. In both these surveys the lands are described as lying between the Three-Cornered pond and West pond. The defendant's survey also describes the lands surveyed by him as a tract of unappropriated land lying between West pond and the Three-Cornered pond. The defendant's title, in virtue of his survey, which was made October 30th, 1880, depends upon the fact of there being unappropriated lands between the two surveys above mentioned.

The running of lines, the fixing of boundaries and the whole location of proprietary rights, are done by the Board of Proprietors, by their own agents, the deputy surveyors and the surveyor-general, the appointees of the board. The board allows no one, who applies for a survey, to select his own surveyor or an indifferent person to make his survey. He must employ the agents of the board, and no surveys will be approved unless made by such agents. *Lippincott* v. *Souder, 3 Halst. 161, 164; Scott* v. *Yard, 1 Dick. Ch. Rep. 79, 88.* About 1786 an order was made by the board requiring its surveyors, in making surveys, to establish a beginning corner, and then confine themselves to strict courses and distances. *Elmer's note to Nix. Dig. (4th ed.) 936.* This order adopted the most unreliable indicia of location and boundaries known to conveyancers, and the courts, in locating these surveys, will resort to every kind of evidence that is competent to establish a disputed boundary. *Scott* v. *Yard, 1 Dick. Ch. Rep. 79, 83.*

The Corlies survey for his tract of thirty-four and ninety hun- dredths acres describes the premises "*as adjoining the ocean* between Three-Cornered pond and West pond," and as

"beginning at the southwest corner of the tract of 183 25 acres returned to E. Brinley, Book S 23, p. 56 &c., it being also at the southwest corner of a tract of land, containing 91 acres and ninety-six hundredths, conveyed by Edward Brinley to John Brown and others, by deed dated December 12, 1861, and recorded in the Monmouth County Clerk's office &c., in Book 161 of Deeds, p. 225;"

thence by courses and distances to the beginning, "being bounded on all sides by prior locations and the ocean."

The description in the Corlies survey of the tract surveyed, as adjoining the ocean, and the call for a boundary on the ocean, fixes his easterly line at the line of ordinary high water, which is also the limit of the title of the Board of Proprietors. The word "adjoining" implies a closer relation than "adjacent." The latter word, uncontrolled by the context or subject-matter, is not inconsistent with the idea of something intervening. But the primary meaning of the word "adjoining" is to lie next to, to be in contact with, excluding the idea of any intervening space. *Johnson* v. *District of Columbia, 9 Cent. Rep. 653, 655; People* v. *Schemerhorn, 19 Barb. 540, 556; In re Ward, 52 N. Y. 395; Akers* v. *N. R. R. and C. Co., 14 Vr. 110.* In *State* v. *Brown, 3 Dutch. 13,* the supreme court, in construing the words "lands adjoining the shore line" of tidal waters, held that these words signified lands reaching to the edge of the water at ordinary high water. The description of the premises in the Corlies survey, with the superadded words, "bounded on the ocean," and the map accompanying the recorded survey indi- cating a line on the ocean, conclusively establish the easterly line of the Corlies survey upon the line of ordinary high water in the ocean. Under such a description, title is conveyed to ordinary high-water mark, with all the incidents of riparian ownership.

Nor does the evidence admit of any doubt that the westerly line of the Corlies survey, with its projections at the northerly and southerly ends, join upon the Brinley survey.

Corlies was deputy surveyor for the Board of Proprietors, and in 1861 made the survey of the Brinley tract. Brinley's survey was recorded in Book S 23 p. 56. Brinley, by a deed dated December 12th, 1861, conveyed to John Brown and six others a tract of ninety-one and ninety-six hundredths acres. That deed was recorded in the Monmouth county clerk's office, in Book 161 of Deeds p. 656. The particularity with which Corlies, in his survey for the thirty-four and ninety hundredths acres, recites these two instruments, of itself indicates that he ascertained that these two tracts had a common boundary at the beginning point of his survey. There is a plain mistake, probably a clerical error, in the statement in the Corlies survey that the corner of the Brinley survey, at which Corlies's beginning corner was located, was the southwest corner of the former survey, the extreme southwest corner of that survey being a considerable distance further west, near the head of the Three-Cornered pond. But this erroneous statement becomes entirely immaterial, on a comparison of other calls in both surveys and in adjoining locations. The Brinley map has disappeared from the records of the Board of Proprietors, and a copy duly proved was put in evidence. By this map it appears that the tract of ninety-one and ninety-six hundredths acres, conveyed by Brinley to Brown and others, is included in the Brinley survey for the one hundred and eighty-three and twenty-five hundredths acres, and comprises the entire easterly part of that survey, the whole distance from Three-Cornered pond to West pond, with its northerly, easterly and southerly lines coincident with the corresponding lines of the survey for one hundred and eighty-three and twenty-five hundredths acres. Corlies testified that when he made his survey he fitted it to Brinley's ninety-one acre tract, which then belonged to Brown and others, and again, in his cross-examination, he said he fitted his tract fast to the Brinley survey for the one hundred and eighty-three acres, and the map annexed to his survey has inscribed upon it along the westerly boundary of his tract, as follows : "183 $25/100$, return to Edward Brinley, Dec. 2, 1861 ; recorded in Book S 23 p. 56." And the call in his survey for a boundary on all sides,

except on the ocean side, by prior locations, is false, unless referred to the Brinley survey. Whitaker, who made a survey of these locations in September, 1880, testified

"that the northerly line of the 183 25–100 survey agreed exactly with the F. Corlies 34.90 ten-chain line, near the northerly end of that survey; the easterly line agreed almost with the westerly line of the 34.90 F. Corlies survey, exactly in distance; the southerly ten-chain line agreed identically with the first line of the 34.90 acre tract, and these three lines also agreed exactly with the corresponding lines of the 91.96 acre deed tract."

The proof in the case by calls, description and boundaries, in the several surveys, as well as by oral testimony, is, in my judgment, conclusive to the effect that the northerly, easterly and southerly lines of the tract of ninety-one and ninety-six hundredths acres are identical with the corresponding lines of the survey for the tract of one hundred and eighty-three and twenty-five hundredths acres, and that those lines are, in fact, also the northerly, westerly and southerly lines of the Corlies tract.

To overcome this testimony, and dissever the Brinley survey from the Corlies survey, and obtain a strip of unappropriated lands between those tracts, the defendant relies upon the survey of the Brinley tract by courses and distances. The beginning corner of that survey is the sixth and northeast corner of a tract returned to Joseph Kinnen, in February, 1760. The location of that corner is a matter of considerable obscurity. The defendant testified that he ascertained its location by the recollection of living witnesses. From the beginning corner as thus ascertained, he made the survey and location of the Brinley tract by courses and distances. The unreliability of this method of locating surveys has already been commented upon. By this process the southerly lines of the Brinley tract are taken away from the Three-Cornered pond, and the Brinley survey is dissevered from the Corlies tract; whereas, the map of the Brinley survey shows the southerly and southeasterly lines on the edge of and in part within the waters of the pond, and Corlies's map shows his survey and the Brinley survey in actual contact, and his testimony is that such was the actual location on the ground. By the same method the location of the tract of ninety-one and ninety-six

hundredths acres sold to Brown is placed, in part, outside of the
Brinley survey; whereas, the Brinley map and the testimony
show that the Brown tract was within the Brinley survey, with
the northerly, easterly and southerly lines of the two tracts iden-
tical in location. It is unnecessary to pursue this subject fur-
ther. It is sufficient to say that, by that class of evidence which
in law is regarded as of a superior order, it is established beyond
a doubt that the Brinley and Corlies surveys adjoin, and that
there are no unappropriated lands between them to which the
defendant's survey of October 20th, 1880, can be applied, and
consequently the complainant's title must prevail.

The jurisdiction of the court of chancery to entertain this suit
is disputed. Possession in fact, as distinguished from that con-
structive possession which arises simply in virtue of legal title,
is essential to proceedings under the statute under which this suit
was brought. *Shepherd* v. *Nixon, 16 Stew. Eq. 627*. The ob-
jection was taken in the answer, and consequently the complain-
ant was put to proof upon the subject. There is competent
evidence in the case touching the peaceable possession of the
complainant, in the sense of the statute, to a portion of the prem-
ises in question. I refer to the testimony of William S. Yard,
on pages 203, 1418, 1419. This testimony is uncontradicted.
Independent of that evidence, I think the complainant was in
actual possession of the strip of land on the bluff, in the statu-
tory sense. The complainant was the owner of this strip as
part of the premises he held under the Brinley survey. This
strip was attached to and used in connection with the tract owned
by the association, and was essential to the advantageous appro-
priation of the entire tract to use for a seaside resort. Actual
possession is necessary to lay the foundation of title by adverse
possession, and in such a controversy as has been shown, posses-
sion of the principal tract is regarded as possession of adjoining
waste and unenclosed pieces of land held under the same title
and used in connection therewith. If this were an action of
ejectment, and title to the bluff was claimed by adverse posses-
sion, it is clear that actual possession by the complainant of the
portion of the Brinley survey undisputed by the defendant

would be regarded as possession of the bluff sufficient to amount to an adverse possession. In *Shepherd* v. *Nixon* the controversy was over a tract of two hundred acres, and there was no proof whatever that the complainant was or ever had been in possession of any portion of the land to which he claimed title. The subject just now discussed did not arise in that case.

Although objection to the jurisdiction was taken in the answer, it is not noticed by the vice-chancellor in his opinion, nor is that question presented in the petition of appeal. Jurisdiction being shown as to the greater part of the land in controversy, and the defendant's title depending upon the same survey, it would answer no substantial purpose to pick out the detached parts in the streets fronting on lots sold by the association before the bill was filed, and undertake to separate them and exclude them from this decree.

The decree advised by the vice-chancellor, so far as relates to the merits of this case, should be affirmed.

The decree awards costs against the defendant. The scheme in which the defendant embarked and his conduct entitle him personally to little consideration with respect to the expenses of this litigation. He was a member of the Ocean Beach Association and an active manager of its affairs. He made the map of 1879, a lithographed copy of which was filed in the clerk's office of Monmouth county. On this map it was stated that one of the natural boundaries of the association was the Atlantic ocean, and the map exhibited an unobstructed approach to the sea. On the faith of these representations a large number of lots were purchased and about five hundred cottages erected. The purpose of the defendant in the survey and location of this strip of land, cutting off access to the ocean, was plainly to embarrass the association and compel the purchase of this strip from him at his own price. He was also a member of the Board of Proprietors and had access to its records, and there is cogent evidence that he had efficient aid from officers of the board in the consummation of his scheme.

But, nevertheless, the court cannot overlook the manner in which the examination of witnesses was conducted. The testi-

Yard v. Ocean Beach Association.

mony alone occupied upwards of two thousand and seven hundred pages of the printed book, at least one-half of which is either unimportant or irrelevant, or taken with needless prolixity. This is notably true of the cross-examination of the defendant's witnesses. The direct examination of the defendant occupies twenty-two pages, his cross-examination five hundred and twenty-eight pages. The direct examination of Roome, another of the defendant's witnesses, occupies eleven pages, his cross-examination one hundred and forty-seven pages. The cross-examinations of others of the defendant's witnesses are similarly extended with needless prolixity.

It is due to the court and its suitors that this mode of conducting examinations should be discountenanced.

The defendant should be decreed to pay the costs in the court of chancery and in this court, but in the taxation of the costs the cost and expenses of taking and printing one-half of the cross-examination of the defendant's witnesses should be disallowed. Except as herein modified, the decree should be affirmed.

*For affirmance* — THE CHIEF-JUSTICE, DEPUE, DIXON, MAGIE, REED, SCUDDER, VAN SYCKEL, BOGERT, BROWN, CLEMENT, KRUEGER, SMITH, WHITAKER—13.

*For reversal*—None.